# VALIDITY OF STATUTORY ROLLBACKS
## AS A MEANS OF COMPLYING WITH THE INELIGIBILITY CLAUSE

*Where a salary increase for an executive office would otherwise create a bar to appointment of a member of Congress under the Ineligibility Clause, compliance with the Clause can be achieved by legislation rolling back the salary of the office before the appointment.*

May 20, 2009

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

We recently have reconsidered the question whether legislation to roll back a salary increase for an executive office can ensure compliance with the Ineligibility Clause of the Constitution if such a rollback occurs before a Senator or Representative is appointed to the office.  The Ineligibility Clause provides that "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time."  U.S. Const. art. I, § 6, cl. 2.  Rollback legislation lowers the salary of an office to the level at which it stood before Congress enacted the increase that would otherwise prohibit the appointment of a Senator or Representative.  A 1987 opinion of this Office took the position that such a law, if passed before the nomination[1] of a Senator or Representative to an office, would not achieve compliance with the Ineligibility Clause.  *See* Memorandum for the Counselor to the Attorney General, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re:  Ineligibility of Sitting Congressman to Assume a Vacancy on the Supreme Court* (Aug. 24, 1987) ("Cooper Memorandum").[*]  That opinion was not in accord with the prior interpretations of this Clause by the Department of Justice and has not consistently guided subsequent practice of the Executive Branch.  For the reasons set forth below, we do not believe it reflects the best reading of the Ineligibility Clause.

## I.

The Ineligibility Clause prohibits the appointment of a Senator or Representative to an "Office . . . which shall have been created, or the Emoluments whereof shall have been encreased" during "the Time for which [the appointee] was elected [to the Congress]."  U.S. Const. art. I, § 6, cl. 2.  As a linguistic matter, the words of the Clause suggest two possible interpretations of the phrase "shall have been encreased."  Under the first interpretation, "shall have been encreased" means "shall have *ever* been encreased."  The Clause thus would call for a series of "snapshots":  if at any time during the term of a member of Congress the emoluments of an office are higher than at another time, the emoluments have "encreased" during the member's

---

[1] President Washington withdrew the nomination of William Patterson to the Supreme Court in 1793 when it appeared Patterson's appointment would violate the Ineligibility Clause.  32 *The Writings of George Washington* 362 (John C. Fitzpatrick ed., 1939).  The Patterson episode established a practice of Presidents not making nominations unless and until any Ineligibility Clause restrictions are eliminated.  *See Office of the Attorney General: Hearing on S. 2673 Before the S. Comm. on Post Office and Civil Service*, 93d Cong. 9 (1973) (statement of Robert H. Bork, Acting Attorney General of the United States); *Appointment to Civil Office*, 17 Op. Att'y Gen. 522 (1883).

[*] Editor's Note:  A copy of the Cooper Memorandum is appended to this opinion.

congressional term, and therefore the member may not be appointed to that office. Under this interpretation, even if a salary is rolled back before the appointment, it still has been "encreased" within the meaning of the Clause. The alternative interpretation is to read "shall have been encreased during such time" as "shall have been encreased *on net* during such time," thereby prohibiting the appointment of a congressional member to an office only when the emoluments of the office are greater at the time of appointment than they were at the start of the member's term.

There is a long history of Executive Branch consideration of which of these interpretations is better, and the Executive Branch has not yet come to rest on a conclusion. For the most part, however, the Executive Branch's interpretations have supported the effectiveness of statutory rollbacks to comply with the Ineligibility Clause, and thus they have adopted, at least implicitly, the "on net" interpretation.

When Congress was considering a bill to roll back the Secretary of State's salary in 1909 in order to permit the appointment of Senator Philander C. Knox, Assistant Attorney General Charles W. Russell gave an "unofficial opinion," published in the Congressional Record, that "the purpose, and the sole purpose of [the Ineligibility Clause] was to destroy the expectation a Representative or Senator might have that he would enjoy the newly created office or the newly created emoluments," and that if a salary increase "is made and then unmade, he can not get, or hope for, anything more than if there had been no such increase." 43 Cong. Rec. 2402, 2403 (1909) (citations omitted). Russell thus concluded that passage of the bill would permit the appointment to be made.

In 1973, Robert H. Bork, the Acting Attorney General, and Robert G. Dixon, the Assistant Attorney General for the Office of Legal Counsel, testified in favor of a rollback of the Attorney General's salary that was intended to permit the appointment of Senator William B. Saxbe as Attorney General, the salary for which office had been increased during the Senator's term in Congress. Acting Attorney General Bork stated that the rollback legislation "should remove any constitutional question which may be raised concerning the appointment of Senator Saxbe to be Attorney General of the United States." *Office of the Attorney General: Hearing on S. 2673 Before the S. Comm. on Post Office and Civil Service*, 93d Cong. 11 (1973) (statement of Robert H. Bork, Acting Attorney General of the United States) ("Bork Statement"). He reasoned that, with regard to the Ineligibility Clause, "the rationale of the constitutional provision [would be] met because the expectation of a higher salary cannot influence Senators' or Representatives' votes on legislation to raise salaries . . . if a Senator or Representative knows . . . that should he ever be nominated for [an office with a raised salary] during his term of office, he will have to accept the lower salary." *Id.* Assistant Attorney General Dixon made a similar argument. *To Reduce the Compensation of the Office of Attorney General: Hearing on S. 2673 Before the S. Comm. on the Judiciary*, 93d Cong. 71, 75 (1973) (statement of Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel) ("Dixon Statement") ("[The proposed rollback legislation] would overcome the . . . evil regarding emoluments by preventing Senator Saxbe from obtaining the benefit of the 1969 salary increase . . . without wastefully barring him from offering his services to the country in an appointive office.").

In 1979, our Office again took this position.  Although we concluded that the Ineligibility Clause did not apply where a salary increase might take place *after* Representative Abner Mikva's appointment to the Court of Appeals, we noted that "even if a salary increase for Federal judges generally were to occur, Congress could, by legislation, exempt from coverage the office to which Representative Mikva may be appointed."  *Constitutional Law—Article I, Section 6, Clause 2—Appointment of Member of Congress to a Civil Office*, 3 Op. O.L.C. 286, 289 (1979); *accord Constitutional Law—Article I, Section 6, Clause 2—Appointment of Member of Congress to a Civil Office*, 3 Op. O.L.C. 298 (1979).  We cited the examples of Philander Knox and William Saxbe.  3 Op. O.L.C. at 289-90.

In addition to those public statements endorsing the constitutional efficacy of rollback legislation, various unpublished memoranda of our Office before 1987 expressed the same view.  In these memoranda, we noted the possible constitutional questions about the effectiveness of salary rollbacks but advised that such rollbacks would achieve compliance with the Ineligibility Clause.  In 1969, then-Assistant Attorney General William H. Rehnquist stated that the argument for the constitutionality of an appointment after a rollback was "perfectly tenable," even though, in his view, the Ineligibility Clause would be "literally violated."  Memorandum for the Honorable Bryce N. Harlow, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re:  Statutory Language to Avoid Prohibition of Article I, Section 6, United States Constitution* at 2 (Nov. 24, 1969).[2]  And in 1980 we advised that legislation to lower the salary of the Secretary of State would permit the appointment of Senator Edmund Muskie to that position.  Memorandum for Alan A. Parker, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel, *Re:  Enrolled bill, "To ensure that the compensation and other emoluments attached to the office of Secretary of State are those which were in effect January 1, 1977" (S. 2637)* (May 8, 1980).

However, in an unpublished opinion written in 1987, this Office reversed course and concluded that salary rollbacks do not satisfy the Ineligibility Clause, thus adopting the "snapshot" interpretation of the Clause.  *See* Cooper Memorandum at 2.[3]  The 1987 opinion argued that the contrary view "simply ignores the plain language of the Ineligibility Clause." *Id.* at 6.  It also argued that in light of "serious reservations about the wisdom of giving to the executive the power to appoint legislators to lucrative and prestigious executive and judicial offices," the Framers had "tried to limit the instances in which the executive could offer such enticements [as appointment to office] to legislators."  *Id.*  Furthermore, because a rolled back salary could be restored to the higher level immediately after the appointment, rollbacks "would

---

[2]  A memorandum from then-Assistant Attorney General Antonin Scalia in 1974 assumed the effectiveness under the Ineligibility Clause of the salary rollback for Attorney General Saxbe and concluded that, although the matter was not free from doubt, the Ineligibility Clause did not bar the same Congress in which Mr. Saxbe had served from restoring the Attorney General's salary to its previous level after Mr. Saxbe's appointment. Memorandum to Hugh M. Durham, Chief, Office of Legislative Affairs, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, *Re:  Proposed Bill to Increase the Salary of the Attorney General* (Nov. 22, 1974).

[3]  An opinion of Attorney General Holmes Conrad concluded in 1895 that Senator Ransom was ineligible under the Clause to be appointed as envoy extraordinary and minister plenipotentiary to Mexico where the salary for that position had been increased during his term. *See Member of Congress—Appointment to Office*, 21 Op. Att'y Gen. 211 (1895).  However, the efficacy of rollback legislation was not at issue.

largely render [the Ineligibility Clause] a nullity." *Id.* at 7. Thus, the opinion reasoned, rollback legislation would "serve[] to frustrate the intentions of the Framers" by making more such appointments possible. *Id.* at 6.[4] The 1987 opinion had set forth the official view of the Office.

## II.

Contrary to the conclusion of the 1987 opinion, however, we do not believe the phrase "shall have been encreased" sets forth "plain language" that renders rollback legislation incapable of bringing an appointment into compliance with the Ineligibility Clause. The "snapshot" interpretation favored by the 1987 opinion is but one possible interpretation of the text and, as a matter of plain language, there is no basis for concluding that it is superior to the "on net" reading that opinion failed to credit.

The "on net" construction represents an entirely natural interpretation of the language. If a potential investor asked for a prediction at the beginning of a year whether a stock index "shall have been encreased" during the year, the question would call for a prediction whether the index would be higher at the year's end as compared to the year's beginning, rather than whether the index would go up at any point during that year, as it inevitably would on numerous occasions every day. Congressman Marlin Olmsted made this point in the debates relating to Senator Knox, noting that:

> even the letter [of the Ineligibility Clause], fairly interpreted, would not apply to this case. After this act is passed it can not be said that the salary of the Secretary of State has been increased, for the salary will then be precisely the same as it had existed for many years prior to the senatorial term which any member of that body was serving in 1907 [when the act to be rolled back was passed].

43 Cong. Rec. 2411 (1909).

This reading also accords with the usage of the word "increased" around the period in which the Clause was enacted. For example, in a report to Congress shortly after the founding, an organization of manufacturers noted that "[t]he value of goods manufactured in the United States . . . amounted, as early as 1810, to upwards of one hundred and seventy-two millions of dollars, which value was very greatly increased during the late war." 36 Annals of Cong. 2288 (1819). Such an observation cannot be understood to mean that at one time during the period concerned the value of the goods had increased, but that the value had returned to its original, lower level by the time of the statement. *See also, e.g.*, Alexander Hay, The History of Chichester 574 (West Sussex Co. & Dioscesan Record Office 1804) (noting that "[t]here is no reason to doubt the accuracy of the survey of 1801, unless it should be suspected that it . . . was

---

[4] A number of scholars who testified in 1973 on the proposed rollback legislation reached the same conclusion as the 1987 opinion. *See, e.g.*, *To Reduce the Compensation of the Office of Attorney General: Hearing on S. 2673 Before the S. Comm. on the Judiciary*, 93d Cong. (1973) (statements of Philip Kurland, William F. Swindler, Paul J. Mishkin, and William D. Lorenson). Other commentators have taken the same view. *See, e.g.*, 1 Westel Woodbury Willoughby, *The Constitutional Law of the United States* 607 (1929); Michael Stokes Paulsen, *Is Lloyd Bentsen Unconstitutional?*, 46 Stan. L. Rev. 907 (1994).

taken at the desire of the ministry . . . that the population of the kingdom should appear increased, and not diminished, after a long destructive war").

We need not conclude, however, that the "on net" interpretation is, as a matter of the plain language, superior to the "snapshot" interpretation. The possibility of these two reasonable constructions shows that, at a minimum, there is no definitive "plain meaning" of the Ineligibility Clause and thus that the text standing alone is ambiguous. Therefore, we must look to evidence of the understandings of the drafters and ratifiers of the Constitution, the purposes of the Clause, and the practice of the political branches in construing and applying that Clause.[5]

## III.

In his treatise on the Constitution, Joseph Story wrote that:

> [t]he reasons for excluding persons from offices, who have been concerned in creating them, or increasing their emoluments, are, to take away, as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of his disinterestedness. The actual provision, however, does not go to the extent of the principle; for his appointment is restricted only 'during the time, for which he was elected;' thus leaving in full force every influence upon his mind, if the period of his election is short, or the duration of it is approaching its natural termination.

Joseph Story, *Commentaries on the Constitution of the United States* § 440, at 311 (Ronald D. Rotunda & John E. Nowak eds., 1987). In other words, Justice Story did not read the Clause as if it were intended to prevent members of Congress from receiving Executive Branch appointments. Rather, he understood it to have been designed to guard against the particular problems that the prospect of such executive appointments might raise. This more qualified understanding of the Clause's purpose finds support in the debates at the Constitutional Convention, and we believe it supplies the correct basis for construing the Ineligibility Clause and applying its restriction on conferring "emoluments" to the issue here.

The Convention considered a number of variations with respect to the Ineligibility Clause. Under the earliest version, as set out in the Virginia Plan's fourth and fifth resolutions, members of Congress would have been "ineligible to any office" under the authority of the United States during their term of election and for some time thereafter, whether or not the office in question had been created, or its emoluments increased, during the legislator's term. 1 *The Records of the Federal Convention of 1787*, at 20 (Max Farrand ed., rev. ed. 1966). In contrast, a proposal offered by Nathaniel Ghorum of Massachusetts would have eliminated the Ineligibility Clause altogether. *Id.* at 375. This proposal reflected the concern that a bar on the

---

[5] In concluding that Senator Kirkwood was ineligible to be appointed to the office of tariff commissioner, an opinion of Attorney General Benjamin Harris Brewster stated that "[i]t is unnecessary to consider the question of policy which occasioned this constitutional prohibition." *Appointment to Civil Office*, 17 Op. Att'y Gen. 365, 366 (1882). Senator Kirkwood, however, was barred from appointment under the Ineligibility Clause because the office unquestionably was "created" during his term as Senator. Therefore, there was no ambiguity in the plain text giving rise to a need to examine the purposes behind the restriction.

appointment of members of Congress to other offices would limit the number of capable persons who could serve in government. *See id.* at 376. For example, James Wilson stated that "[s]trong reasons must induce me to disqualify a good man from office," *id.* at 379, and that "we ought to hold forth every honorable inducement for men of abilities to enter the service of the public," *id.* at 380. Alexander Hamilton made the additional argument that the Executive would need the power to appoint Senators and Representatives to high office: "Our prevailing passions are ambition and interest," Hamilton observed, and the executive might have to "avail himself of those passions" to induce the legislature to act for "the public good." *Id.* at 381.

Between these two extremes—one which would have established a categorical bar against any sitting member of Congress's appointment to executive office and another which would have placed no restrictions on such appointments at all—James Madison argued for a "middle ground between an eligibility in all cases, and an absolute disqualification." *Id.* at 388. Although Madison opposed the severity of the Virginia Plan's provisions, he conceded that there were instances in which the appointment of a member of Congress to another office would be undesirable. Without some form of the Ineligibility Clause, "there may be danger of creating offices or augmenting the stipends of those already created, in order to gratify some members if they were not excluded." *Id.* at 380. Appointing members of Congress to newly created offices or to offices with recently augmented salaries "were the evils most experienced," and Madison supposed that "if the door was shut agst. them, it might properly be left open for the appointt. of members to other offices as an encouragmt. to the Legislative service." *Id.* at 386. The goal was for "the national legislature to be as uncorrupt as possible." *Id.* at 392.

Although the version of the Clause that the Committee on Detail eventually presented to the Convention was a modification of the broad restriction in the Virginia Plan,[6] Madison's middle position eventually prevailed. 2 *id.* at 492. The aim behind the Ineligibility Clause was thus to take away the possibility that Congress would create offices or increase emoluments in order to "gratify" members who might then gain appointment, while preserving sufficient eligibility for the appointment to executive office of qualified officials serving in Congress.[7] In that way, the Clause would ensure that the national legislature would be "as uncorrupt as possible." 1 *id.* at 392.

This basic purpose, as reflected in the Clause's drafting history, helps to resolve the ambiguity in the text. It indicates that the phrase "shall have been encreased" should be construed to mean "shall have been encreased on net" during the course of a Congress member's term. The alternative, snapshot reading, while plausible linguistically, would result in the Clause

---

[6] Article VI, section 9 of the draft Constitution made members of the House "ineligible to, and incapable of holding any office under the authority of the United States" during the term for which they have been elected. 2 *The Records of the Federal Convention of 1787*, at 180. This version also made Senators "ineligible to, and incapable of holding any such office for one year afterwards." *Id.*

[7] During the ratification debates in Virginia, Madison explained that the Ineligibility Clause "guards against abuse by taking away the inducement to create new offices, or increase the emoluments of old offices." 10 *The Documentary History of the Ratification of the Constitution* 1262 (John P. Kaminski & Gaspare J. Saladino eds., 1976-1993). But he also noted that it would be "impolitic to exclude from the service of his country, in any office, the man who may be most capable of discharging its duties, when they are most wanting." 3 *The Records of the Federal Convention of 1787*, at 315.

operating as a nearly categorical bar to the appointment of members of Congress, given the likelihood of a salary increase during a member's (and particularly a Senator's) term. Such a broad bar to appointment, however, is what Madison and other delegates sought to avoid by adopting Madison's compromise position and rejecting the complete bar to eligibility for members of Congress that had been proposed. Madison's compromise position, and the version of the Clause ultimately adopted, to use Justice Story's words, reflects the "reasons for excluding persons from offices" rather than an intention to establish a restriction that would be untethered to those specific reasons. As first Madison, and then Justice Story explained, those reasons related to the concern that members of Congress would vote to establish new or higher paying offices to "gratify" themselves as future officeholders rather than out of a disinterested judgment about the need for such legislation.

This understanding of the Clause's purpose reveals the superiority of the "on net" construction of the ambiguous textual phrase "shall have been encreased." A member of Congress could hardly be said to be seeking to "gratify" himself in approving legislation to increase the salary of an office if he knew that the Clause would bar him from taking that office unless the salary had first been rolled back prior to his appointment. As Acting Attorney General Bork stated, "the expectation of a higher salary cannot influence Senators' or Representatives' votes on legislation to raise salaries . . . if a Senator or Representative knows . . . that should he ever be nominated for [an office with a raised salary] during his term of office, he will have to accept the lower salary." Bork Statement at 11.

The allowance for rollback legislation, therefore, does not violate the "plain language" of the Clause, or otherwise frustrate its purposes, as our 1987 opinion erroneously concluded. To the contrary, construing the Clause to permit appointments following rollback legislation advances the purposes behind the Ineligibility Clause by "assur[ing] the appointment eligibility of Members of Congress where there is no possibility of profit from offices created, or salaries increased, during the time for which they were elected." *See To Reduce the Compensation of the Office of Attorney General: Hearing on S. 2673 Before the S. Comm. on the Judiciary* at 51 (Statement of William Van Alstyne) ("Van Alstyne Statement"). As Senator Philip Hart said in the debates on the rollback legislation for William Saxbe, such a law "would not 'evade' the bar intended by the Framers; rather, it would implement it and maintain its effectiveness, both in the present instance and as a deterrent to log rolling or improper executive-legislative collaboration in the future." 119 Cong. Rec. 38,346 (1973). Thus, he continued,

> rather than saying [the law] permits evasion of the constitutional provision, it is more correct to say the ban has here served its purpose. It has forced a statute denying any benefit, and without the statute the ban would prevent the appointment. If the purpose can thus be accomplished, to do more would do violence to the other competing consideration in the original compromise: namely, Madison's concern that good men not be precluded from executive service for existing posts.

*Id*. at 38,347.[8]  *See also* Dixon Statement at 71, 81 ("A major purpose of the Ineligibility Clause . . . was the prevention of the evils which would arise if legislators could benefit from the creation of new offices or increase in the emoluments of existing ones . . . . S. 2673 would overcome the former evil regarding emoluments by preventing Senator Saxbe from obtaining the benefit of the 1969 salary increase.").  Senator Olmstead, in defending the constitutional efficacy of the rollback legislation proposed to permit the appointment of Senator Knox, expressed the similar view that such proposed legislation "if enacted will be not an evasion of, but in compliance with [the Ineligibility Clause]."  43 Cong. Rec. 2410 (1909).[9]

Some commentators favoring the "snapshot" interpretation have argued that, contrary to Justice Story's view, the predominant purpose of the Ineligibility Clause was "to protect against legislative corruption by the executive's appointment power" and "to prevent the offering of high position as an inducement to legislators."  *See* Daniel H. Pollitt, *Senator/Attorney-General Saxbe and the "Ineligibility Clause" of the Constitution:  An Encroachment Upon Separation of Powers*, 53 N.C. L. Rev. 111, 122-23 (1974); Comment, *The Ineligibility Clause:  An Historical Approach to Its Interpretation and Application*, 14 John Marshall L. Rev. 819, 824 n.31, 828 (1981); *but see* John F. O'Connor, *The Emoluments Clause:  An Anti-Federalist Intruder in a Federalist Constitution*, 24 Hofstra L. Rev. 89, 164, 172-73 (1995) (arguing that the Framers did not view this as the central purpose of the Clause).  Assistant Attorney General Dixon recognized this as a purpose of the Clause in testifying before Congress on the rollback bill introduced to permit the appointment of Senator Saxbe as Attorney General, *see* Dixon Statement at 70, and our 1987 opinion recognizes it as well, *see* Cooper Memorandum at 6.

This alternative account of the purpose of the Clause does not, however, favor the "snapshot" interpretation, and thus it does not cast doubt on the constitutional effectiveness of rollback legislation.  Even if one understands a concern about undue executive pressure on the legislature to have influenced the delegates to the Constitutional Convention in negotiating the Clause, the "on net" construction of "shall have been encreased" is still the superior reading.  Although there is some support in the history of the Constitutional Convention for the view that the drafters of the Ineligibility Clause had a concern about improper executive influence through the appointment power, the text of the Clause shows that this concern was not its overriding and unqualified purpose.  By its terms, the Clause does not prohibit the President from appointing a sitting member of Congress to an Executive Branch office.  The delegates rejected the Virginia

---

[8]  As Professor Van Alstyne pointed out, grants of immunity under the Fifth Amendment are analogous.  Van Alstyne Statement at 56, 66.  The Fifth Amendment provides that "[n]o person . . . shall be compelled to be a witness against himself in any criminal case."  Testimony may be compelled, however, if the witness is granted immunity, so that the testimony cannot be used against him.  18 U.S.C. § 6002 (2006); *Kastigar v. United States*, 406 U.S. 441 (1972).  The federal immunity statute is not an "evasion" of the Fifth Amendment.  Rather, it respects the constitutional command.

[9]  It might be argued that the text of the Ineligibility Clause precludes the effectiveness of rollback legislation, because it does not expressly permit Congress to make exceptions, in contrast with other constitutional provisions.  For example, the Emoluments Clause states that "no Person holding any Office or Profit or Trust under them, shall, *without the Consent of the Congress*, accept of any present, Emolument, Office or Title, of any kind whatever, from any King, Prince, or foreign State."  U.S. Const. art. I, § 9, cl. 8.  Rollback legislation, however, is not an exception to the Clause, but rather a means for ensuring that the facts that would trigger the bar are not in place.  Rollback legislation is thus more analogous to situations in which the Emoluments Clause would not apply at all, such as when the gift comes from a foreign jurisdiction after Congress has incorporated it into the United States.

Plan, which would have done so. In that regard, the Clause could not have been designed to root out any possible Executive Branch use of the appointment power to influence members of Congress. Indeed, in forging his compromise, Madison was clear in not seeking to impose such a draconian rule. *See* Van Alstyne Statement at 53 ("[N]ot to recognize the efficacy of [rollback legislation] . . . would itself offend one of the reasons that accounted for the final form of [the Ineligibility Clause]: to assure the eligibility of Members of Congress for appointment to vacancies in existing offices, insofar as neither the office itself nor any prerequisite associated with that office would result to them as a consequence of any act of Congress during [their] term.").

The issue, then, is whether the "snapshot" interpretation of "shall have been encreased" would appreciably guard against the corrupting influence of executive appointments, even though the Clause poses no general bar to the Executive offering them as inducements. We do not see how it would. A construction of the Clause that would permit rollback legislation would seem well-designed to check the Executive from unduly influencing congressional members with the prospect of attractive appointments, given that appointments in general are not prohibited. Any tangential effect that the increase in the pay of an office might otherwise have on the President's ability to influence Congress by promising appointment to such office would be negated by the expectation of the enactment of rollback legislation. Thus, as with the desire to avoid self-dealing by the legislature, conceding the efficacy of rollback legislation would comport with this purpose of the Ineligibility Clause. *See* Dixon Statement at 71 ("S. 2673 would overcome the . . . evil regarding emoluments by preventing Senator Saxbe from obtaining the benefit of the 1969 salary increase and any other emoluments, without wastefully barring him from offering his services to the country in an appointive office."). Or at least, the possibility of corrupting influence would exist only insofar as it would exist in the absence of the Ineligibility Clause altogether: by its terms, the Ineligibility Clause does not prevent Congress and the President from colluding to make a deal in which the President would appoint a congressional member to an office (the salary of which had never been raised during the relevant period) and Congress would later raise the salary of that office. *See* 3 Op. O.L.C. at 288; *Member of Congress—Appointment to Civil Office Prior to Pay Increase*, 42 Op. Att'y Gen. 381 (1969) (concluding that subsequent increase in the emoluments of an office would not disqualify a member from appointment to that office). We thus disagree with the 1987 opinion's assertion that conceding the efficacy of rollback legislation would "serve[] to frustrate the intentions of the Framers." Cooper Memorandum at 6.

Finally, it has been argued that the Framers intended the Ineligibility Clause to limit the growth of the national government, and that this purpose would be best served by denying the effectiveness of rollback legislation. *See* O'Connor, *supra*, at 164, 170-71. According to this argument, if rollback legislation is ineffective, Congress will be less likely to increase the pay of offices in the first instance, because its members will want to maintain their eligibility for appointment; as a result, the purpose of economy will be advanced more completely than if a rollback were effective. *Id.* at 170-71. This argument, we believe, is mistaken and cannot be reconciled with the text of the Ineligibility Clause. It would find in the Ineligibility Clause a purpose to restrict the pay of all offices, including those filled by persons who are not appointed from the Congress after a salary increase and thus are not mentioned in the Ineligibility Clause. If that were the intended function of the Clause, however, it would not have been drafted in so

limited a manner. To the extent the debates in the Constitutional Convention considered the relationship of the Ineligibility Clause to the size of the federal government, the delegates tied that concern to the increases that would result from allowing members of Congress to create, or raise the pay of, offices they would themselves then occupy. *See, e.g.*, 1 *The Records of the Federal Convention of 1787*, at 380 (Mason) (cautioning that, without the Ineligibility Clause, members of Congress "may make or multiply offices, in order to fill them"); *see also id.* at 387 (Mason) (referring to the Virginia legislature's "partiality . . . to its own members"); *id.* at 388 (Elbridge Gerry) (members will care more about themselves than their relatives and friends); *id.* at 392 (Madison) (all "public bodies" are inclined to support their own members).

Our construction depends on the judgment that rollback legislation suffices to further the Clause's underlying purposes, but those who take the other side of this question have contested that judgment. They contend that, even with rollback legislation, the purposes of the Ineligibility Clause are not fulfilled. They raise three arguments along these lines.

The first argument is that "an office for which Congress has once voted a pay increase has been made more attractive . . . even if Congress passes remedial legislation," because "in such a case Congress is infinitely more likely to revote the pay increase as soon as the [member's] disqualification expires than if Congress had never voted a pay increase for the office." 119 Cong. Rec. 38,331 (1973) (letter from then-Professor Stephen G. Breyer). This argument is arguably supported by some practice. Setting aside the two most recent instances of rollback legislation, of the remaining five instances where Congress rolled back salaries for specific appointees, the appointees in two cases later benefitted, however briefly, from a restored salary. Philander Knox's term as Senator would have ended in 1911; subsequently, in 1912, his previously rolled-back salary as Secretary of State was increased*, see* Pub. L. No. 62-299, 37 Stat. 360, 372 (1912), and he enjoyed that benefit until he resigned in 1913. The bill rolling back the salary in the case of Representative Casey provided for a salary increase to the pre-rollback position at the end of what would have been his congressional term or upon the appointment of a successor to his executive office, whichever was earlier. Pub. L. No. 94-195, § 1(b), 89 Stat. 1108 (1975). His term would have ended in January 1977, yet he remained at the Federal Maritime Commission until October 1977, meaning that he enjoyed a few months of the higher salary after his congressional term would have expired.[10]

Despite the force of this argument, at the time Congress first acts to increase the salary of the federal office, that higher level of pay remains a "conjectural reward[] a nominee may enjoy after his [congressional] term expires." 119 Cong. Rec. 38,347 (1973) (statement of Senator Hart, arguing that weighing such rewards goes beyond the bounds drawn by the Framers); *cf.* Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of Ineligibility Clause to Appointment of Congressman Tony P. Hall* at 3-4 (May 30, 2002) (noting, with respect to an office the pay for which is set at the time of each appointment, that although prior action raising the salary of the previous appointee to the office "arguably might lead to some expectations

---

[10] The legislation affecting Senator Muskie also included such a provision. Pub. L. No. 96-241, § 1(b), 94 Stat. 343 (1980). But Secretary of State Muskie resigned before the term for which he had been elected Senator would have ended.

about the salary to be paid [to the subsequent appointee] . . . this expectation is, in the end, a matter of speculation" and "[u]ntil the President [] or his delegate acts, there are no emoluments attached to the office in question"). At the time of a salary increase, it cannot be known whether Congress in the future, if it rolls back the increase, will also provide for its restoration or whether the prospective appointee will still occupy the executive office at the time that any such restoration takes effect. In three of the five historical cases of individual rollbacks, the appointees never drew a restored salary. Attorney General Saxbe's term would have ended in January 1975; he resigned in February 1975; and later that month Congress restored the Attorney General's salary, retroactively to the day after Mr. Saxbe's resignation. Pub. L. No. 94-2, 89 Stat. 4 (1975). Upon a change in administration, Secretary of State Muskie resigned before the term for which he had been elected Senator would have ended. Treasury Secretary Bentsen resigned in 1994, shortly after the end of the term for which he had been elected Senator. Congress did not restore the salary for the office of Secretary of the Treasury until 1997. Pub. L. No. 105-61, § 116, 111 Stat. 1272, 1284 (1997). The possibility that an officer appointed after a salary rollback will ever receive the higher salary is speculative. At the very least, there is no practice, as far as we have been able to determine, of Congress immediately increasing salaries after a rollback, as then-Professor Breyer conjectured.

The second argument contends that, whether or not the fact of an increase during a member's term makes a post-appointment increase more likely, the current Congress, through a post-appointment enactment, might immediately restore the rolled back salary of the position after the member of Congress is appointed. The 1987 opinion states: "Congress could in all cases reduce the salary of the congressman on the day before he is nominated and restore it to its increased level on the day after he is commissioned." Cooper Memorandum at 6. As explained above, it does not appear that Congress has ever taken such a step. Nevertheless, according to this argument, the mere possibility that Congress might restore the salary as of the day after commissioning demonstrates the invalidity of the rationale on which rollback legislation is based.

This argument has prompted a range of responses. Acting Attorney General Bork said that he "would like to address that question at that time, if things fall out that way." Bork Statement at 12. Professor Van Alstyne took the position that the former member could not accept a salary increase enacted by the same Congress that voted a roll-back. Van Alstyne Statement at 53. Assistant Attorney General Scalia thought that, although the matter was not free from doubt, a post-appointment enactment restoring the salary would be constitutional and could be accepted by the former member. Memorandum to Hugh M. Durham, Chief, Office of Legislative Affairs, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Bill to Increase the Salary of the Attorney General* at 3 (Nov. 22, 1974) ("Scalia Memorandum").

We agree with Acting Attorney General Bork's approach: there is no need to deal with this issue until Congress actually seeks to restore a rolled-back salary immediately upon an appointee's taking office. We only note that, even if Congress did take such action, it would not necessarily be inconsistent with the purposes behind the Ineligibility Clause. The former member, no longer being in Congress, might have lost much of his power to influence congressional action. Thus, a salary restoration enactment after his appointment to office might

not be a subterfuge by which the constitutional restraint against self-dealing would be avoided. Likewise, post-appointment legislation restoring the salary of an office to its pre-rollback level would not promote the ability of the executive corruptly to wield influence over the legislative branch insofar as the appointment would already have been completed. The speculative possibility, pre-appointment, that the salary of the office would later be restored, would hardly seem sufficient enticement to achieve improper executive influence over prospective appointees in Congress. Accordingly, the possibility of the repeal of the salary rollback, in itself, is not a good reason for abandoning the view that a salary rollback achieves compliance with the Ineligibility Clause.

The third and final argument is that "the purpose of the provision is to prevent Congress from [passing] special legislation for the benefit of one of its own Members" and that a rollback statute "would have no function or purpose except to qualify a particular member of . . . Congress for an office for which he could not otherwise qualify." *To Reduce the Compensation of the Office of Attorney General: Hearing on S. 2673 Before the S. Comm. on the Judiciary* at 6 (statement of Professor Philip Kurland). Unlike the first two arguments, this one attacks the constitutionality of the rollback legislation itself, rather than the subsequent appointment.[11] In precisely this respect, however, the argument does not square with the language of the Ineligibility Clause. By its terms, the Clause does not address any legislation, whether for the benefit of a particular congressional member or for the benefit of a more general class. Instead, it forbids *appointment* to civil office. *See* Scalia Memorandum at 4. This argument, therefore, does not convincingly answer the case in favor of the effectiveness of rollback legislation.

## IV.

Our conclusion that the history and purposes of the Clause favor a construction of the text that permits rollback legislation to bring an appointment into constitutional compliance draws further support from the practice of the political branches for more than a century. Several Congresses, as well as administrations of both parties, have affirmed that salary rollbacks achieve compliance with the Ineligibility Clause.

On at least seven occasions since the Civil War, Congress has rolled back the salary paid for service in an office, and subsequent to such rollbacks, the Senate has confirmed and the President has appointed a member of Congress who would otherwise have been barred from that office. First, in 1876, while Senator Lot M. Morrill was serving a term that had begun in 1871, he was nominated, confirmed, and appointed as Secretary of the Treasury. Congress had raised cabinet members' salaries from $8,000 to $10,000 in 1873 and then, in an effort at fiscal retrenchment, had returned the salaries in 1874 to their previous level. Act of Mar. 3, 1873, ch. 226, 17 Stat. 485, 486; Act of Jan. 20, 1874, ch. 11, 18 Stat. 4. In this instance, unlike the others that followed, the lowering of the salary was not expressly for the purpose of achieving compliance with the Ineligibility Clause. Nevertheless, absent the salary reduction, Senator

---

[11] Professor Van Alstyne's *answer* to the second objection—that a statute to restore an appointee's salary before the end of the term for which he had been elected would be unconstitutional—is similar to the third objection in the sense that it asserts the unconstitutionality of legislation, rather than of an appointment.

Morrill would not have been eligible for the office. Second, in 1909, Congress reduced the salary of the Secretary of State so that Senator Philander Knox could be appointed to the office. During Knox's term in the Senate, Congress had raised the salary of cabinet positions from $8,000 to $12,000. Pub. L. No. 59-129, 34 Stat. 935, 948 (1907). When President Taft announced his intention to nominate Knox, Congress reduced the Secretary of State's salary to $8,000, Pub. L. No. 60-235, 35 Stat. 626 (1909), and Knox was then confirmed and appointed. Third, in 1973, Congress reduced the Attorney General's salary from $60,000 to $35,000, thus rolling back a raise that had become effective during William Saxbe's term in the Senate. Pub. L. No. 93-178, 87 Stat. 697 (1973). Fourth, at the request of Attorney General Edward H. Levi, Congress in 1975 reduced the salary of a position as Federal Maritime Commissioner, in order to permit Congressman Robert Casey to be appointed, and Casey was confirmed and appointed to that position. Pub. L. No. 94-195, 89 Stat. 1108 (1975); 121 Cong. Rec. 40,811 (1975). Fifth, in 1980, Congress rolled back the salary of the Secretary of State to permit Senator Edmund Muskie to be appointed. Pub. L. No. 96-241, 94 Stat. 343 (1980). Sixth, in 1993, a salary rollback for the Secretary of the Treasury enabled Senator Lloyd Bentsen to be appointed. Pub. L. No. 103-2, 107 Stat. 4 (1993). The bill was signed by President George H.W. Bush, without any mention of a constitutional concern. 2 *Pub. Papers of George Bush* 2323 (1993). Finally, Congress passed legislation, signed by President George W. Bush, rolling back the salary for the Secretaries of State and the Interior in order to permit the appointment of Senators Hillary Clinton and Ken Salazar to those respective offices by President Obama once he assumed office. *See* Pub. L. No. 110-455, 122 Stat. 5036 (2008) (concerning emoluments of Secretary of State); Pub. L. No. 111-1, 123 Stat. 3 (2009) (concerning emoluments of Secretary of the Interior).[12]

On two of these occasions, Congress thoroughly debated the constitutional issues before approving the rollback legislation. In 1909, the bill to reduce the salary of the Secretary of State prompted a full debate in the House of Representatives, during which opponents of the measure argued for its defeat on the ground that it would not bring Senator Knox's prospective

---

[12] The Ineligibility Clause was also at issue when President Roosevelt nominated Senator Hugo Black to the Supreme Court. Note, *Courts—Legality of Justice Black's Appointment to Supreme Court*, 37 Colum. L. Rev. 1212 (1937). The Senate, in passing the Retirement Act of 1937, had increased the retirement pay of Justices. Pub. L. No. 10, 75 Stat. 24 (1937). It was argued at the time that there had been no increased emolument as to Justice Black because he would not have become eligible for retirement unless he served for almost 20 years on the Court. Edward S. Corwin, *The President: Office and Power, 1787-1957*, at 72-73 (4th rev. ed. 1957); *see also State ex rel. Todd v. Reeves*, 82 P.2d 173 (Wash. 1938) (contemporaneous case reaching conclusion that retirement benefits are not "emoluments" under state constitution); *cf. President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187 (1981) (California retirement benefits are not "emoluments" within the constitutional provision barring the President from receiving "emoluments" from any state); Unpublished Comptroller General Opinion B-207,467, 1983 WL 27823 (Comp. Gen.) (Jan. 18, 1983) (same). After Senator Black was confirmed and took office, the Supreme Court dismissed, for lack of standing, a challenge to his authority as Justice. *Ex parte Levitt*, 302 U.S. 633 (1937). The Black nomination did not involve any issue of rollback legislation. Similarly, when Representative Abner Mikva was nominated to the United States Court of Appeals for the District of Columbia Circuit, opponents argued that his appointment was barred by a pay increase that might have gone into effect after his confirmation. Our Office concluded that it was uncertain whether the salary increase would take place and thus that the Ineligibility Clause would not forbid the appointment, 3 Op. O.L.C. at 289, and a challenge to Judge Mikva's appointment was dismissed on standing grounds. *See McClure v. Carter*, 513 F. Supp. 265 (D. Idaho), *aff'd sub nom. McClure v. Reagan*, 454 U.S. 1025 (1981). Again, no issue of a rollback was involved.

appointment into conformity with the Ineligibility Clause. *See* H.R. Rep. No. 2155, at 2-3 (1909) (Views of the Minority); 43 Cong. Rec. 2390-2402, 2410-2415 (1909). Eventually, Congress voted to pass the rollback legislation, and it was signed by President Taft. Again in 1973, when the bill to roll back the Attorney General's salary was under consideration, the Post Office and Civil Service Committee and the Judiciary Committee of the Senate held hearings on the constitutional issues, and the Senate debated those issues at length. *Office of the Attorney General: Hearing on S. 2673 Before the S. Comm. on Post Office and Civil Service*, 93d Cong. (1973); *To Reduce the Compensation of the Office of Attorney General: Hearing on S. 2673 Before the S. Comm. on the Judiciary*, 93d Cong. (1973); 119 Cong. Rec. 36,484-36,485, 38,315-38,349 (1973). After this deliberation, Congress passed the bill, Pub. L. No. 93-178, 87 Stat. 697 (1973), President Nixon signed it without constitutional objection, and Congress subsequently confirmed Senator Saxbe as Attorney General.

Accordingly, the practice of the political branches, over more than a century and after serious deliberation, supports the effectiveness of rollback legislation to achieve compliance with the Ineligibility Clause. As Chief Justice John Marshall wrote in *McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 315 (1819), where "the great principles of liberty are not concerned," any doubtful question, "if not put at rest by the practice of the government, ought to receive a considerable impression from that practice." *Id.* at 401.[13]

## V.

For these reasons, we believe that, where a salary increase for an office would otherwise create a bar to appointment of a member of Congress under the Ineligibility Clause, compliance with the Clause can be achieved by legislation rolling back the salary of the executive office before the appointment.

/s/


DAVID J. BARRON
Acting Assistant Attorney General

---

[13] Although the Presidents and Congresses passing rollback legislation could be seen as the parties that the Ineligibility Clause was meant to restrain, and thus it could be argued that their practice is not entitled to much weight, such an argument would overlook that Presidents, Senators, and Representatives all swear an oath pledging support for the Constitution, U.S. Const. art. VI, cl. 3, and should be presumed to take this oath seriously. Their long-standing practice may not be conclusive, but surely it merits respect.



Office of the
Assistant Attorney General

*Washington, D.C. 20530*

**AUG 24 1987**

MEMORANDUM FOR THE COUNSELOR TO THE ATTORNEY GENERAL

Re:  Ineligibility of Sitting Congressman
to Assume A Vacancy on the Supreme Court

This memorandum is to confirm advice previously given to you orally that Article I, section 6 of the Constitution prohibits in all circumstances the appointment of those now serving as Senators and Members of the House of Representatives to the current vacancy on the Supreme Court.

I.

The Ineligibility Clause of the Constitution provides:

No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, <u>or the Emoluments whereof shall have been encreased during such time</u>; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office (emphasis added).

Art. I, sec. 6, cl. 2.

The salaries of all Associate Supreme Court Justices were increased on February 4, 1987 to $115,000.[1]  Therefore, whatever the ultimate fate of the salary applicable to the Supreme Court seat now vacant, it is plain that the "Emoluments" of that "civil Office" were "encreased" during the "Time for which" each now-seated congressman "was elected."  The plain meaning of this clause thus disqualifies those now serving in Congress from being appointed to the Supreme Court.

---

[1] Proposed increases in judicial salaries are transmitted to Congress by the President, based upon the recommendations of the Commission on Executive Salaries, which was created by Public Law 99-190.  Congress may then take action to block the proposed increases.  If it does not, the increases go into effect automatically.  The increase in the salaries of Associate Supreme Court Justices was included in the President's Fiscal Year 1988 Budget Message, and Congress allowed the increase to take effect.

Although this would seem to end the matter, in fact a number of past administrations have circumvented the effect of this clause. This has been accomplished by having Congress restore the salary of the office to which the President sought to appoint a sitting congressman to the amount paid for that office when the prospective nominee assumed his seat in Congress. (For the sake of clarity and convenience I will refer to the salary applicable at the time the congressman took his congressional seat as the "original salary" and the office to which the President seeks to nominate a congressman as the "vacant office.") It is therefore necessary to examine this practice to determine if it comports with either the letter or the spirit of the Constitution. We conclude that it does not, and therefore recommend against the use of such a device.

Although the Records of the Constitutional Convention do not directly address this specific issue, they nonetheless provide valuable guidance in two ways: they reveal the concerns of the Founders prompting their inclusion of this clause in the Constitution, and they show that the artifice of reducing the salary of a particular vacant seat was in no way contemplated. Specifically, they reveal that the Framers' concerns extended beyond merely the precise amount that would be paid a congressman assuming a vacant office.

The language first proposed at the Constitutional Convention would have permanently barred all members of the House from assuming any seat created during their tenure in Congress. Many supported that proposal. For example, James Madison stated unequivocally: "I am . . . of the opinion that no office ought to be open to a member, which may be created or augmented while he is in the legislature." 1 M. Farrand, The Records of the Federal Convention of 1787 380 (1966)(hereinafter "Farrand"). Roger Sherman was "for entirely incapacitating members of the Legislature. He thought their eligibility to offices would give too much influence to the Executive. He said the incapacity ought at least be extended to cases where the salary should be increased, as well as created, during the term of the member. He mentioned also the expedient by which the restriction could be evaded to wit: an existing officer might be translated to an office created, and a member of the Legislature be then put into the office vacated (emphasis in original)." 2 Farrand at 490. Edmund Randolph "was inflexibly fixed against inviting men into the Legislature by the prospect of being appointed to offices." Id. at 491. George Mason agreed as well.

In the end, the motion to bar all legislators from ever taking offices created or for which the salaries were increased during their term in Congress was defeated. In large part this was due to the fact that the "first Legislature [would] be composed of the ablest men to be found," id. (remarks of Pinkney), whom they did not wish to prevent forever from holding the many offices that would be created during that term of Congress. But the serious consideration given to the idea of a

complete bar helps to put in perspective the Founders' concern on this question, and their view of its importance in maintaining the proper balance between the three coordinate branches.

Opinions of the Attorney General going back over one hundred years further demonstrate the force of the Ineligibility Clause. For example, Attorney General Benjamin Harris Brewster held that Senator Kirkwood, who had been elected to a term expiring 1883, could not assume the post of tariff commissioner in 1882. That Kirkwood had not been a Senator when the office was created, having resigned in March of 1881 to serve as Secretary of the Interior, did not change Harrison's analysis. 17 Op. Att'y Gen. 365 (1882). He there opined:

> I must be controlled . . . by the positive terms of the provision of the Constitution. The language is precise and clear, and, in my opinion, disables him from receiving the appointment. The rule is absolute, as expressed in the . . . Constitution, and behind that I can not go, but must accept it as it is presented regarding its application in this case.

Id. at 366.[2]

Acting Attorney General Holmes Conrad echoed Harrison's words twelve years later in the face an attempted circumvention of the Ineligibility Clause. In that case Senator Matthew W. Ransom was appointed to be ambassador to Mexico, despite his having voted to increase the salary of that position in 1891. His term was scheduled to end on March 4, 1895. He was nominated and confirmed as of February 23rd, but his commission was not signed until March 5, 1895. Acting Attorney General Conrad could not have been clearer: "Mr. Ransom was not, in my opinion, eligible to appointment to that office." 21 Op. Att'y Gen. 211, 214 (1895).

In 1922 Attorney General Harry Daugherty articulated the two events that must coincide for a congressman to be disqualified from assuming an office because of the Ineligibility Clause.

---

[2] The next year Attorney General Brewster opined that the Ineligibility Clause prohibits even the nomination and confirmation of a sitting congressman to an office created or for which the salary has been increased during his term in office, even if the commission is not signed until after his ineligibility ceases. Under this analysis, President Reagan could not nominate a congressman in the fall of 1988 -- even assuming that the Senate would confirm the candidate -- and sign the congressman's commission on January 4, 1989, after the congressman's term (and thus ineligibility) has ended, but before the President's term ends on January 20, 1989. See 21 Op. Att'y Gen. 211, 214 (1895)("Although he might have been commissioned on the 5th day of March, yet if he was nominated and confirmed on the 23rd of

(a) Increasing the emoluments of an office;
(b) appointing a Senator or Representative to an office the emoluments of which had been increased, both occurring during the term which the Senator or Representative was then serving (emphasis in original).

33 Op. Att'y Gen. 88, 89 (1922). Both are present with respect to currently-sitting congressmen. The salaries of the Supreme Court Justices were increased during the most recent term. This should disqualify all those congressman now in office from being appointed to the current vacancy on the Supreme Court.[3]

## II.

First in 1876, then again in 1909, and most recently in 1973, congressmen who were constitutionally disabled from serving in certain offices were nominated and confirmed after Congress reduced the salaries of the vacant offices to the salary applicable when the prospective nominees first began their congressional terms.[4] In 1876 Lot M. Morrill was appointed to serve as Secretary of the Treasury after having been elected to the Senate in 1871. Cabinet officers' salaries had been raised in

---

[2] (Cont.) February, that, under the rule stated, would seem to be the date of [the] appointment.")

[3] Attorney General Daugherty's statement that "[t]here is a dearth of authority on this question and no decided cases" remains true today. He, however, like his predecessor Acting Attorney General Conrad, was strongly influenced by the thoughts of Judge Story on this question:

The reasons for excluding persons from offices who have been concerned in creating them, or increasing their emoluments, are to take away, as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of his disinterestedness. The actual provision, however, does not go to the extent of the principle, for his appointment is restricted only 'during the time for which he was elected,' thus leaving in full force every influence [on] his mind, if . . . [the] election is short or the duration of it is approaching its natural termination.

Id. at 88-89.

[4] The following historical background is drawn in large part from the testimony of Acting Attorney General Robert H. Bork in 1973. To Insure that the Compensation and Other Emoluments Attached to the Office of Attorney General Are Those Which Were In Effect on January 1, 1969: Hearings on S. 2673 Before the Senate Committee on Post Office and Civil Service, 93rd Cong., 1st Sess. 8-16 (1973).

1873 from $8,000 to $10,000 and reduced in 1874 back down to $8,000. Senator Morrill's nomination was nonetheless confirmed by the Senate.[5]

In 1909, Senator Philander Knox, who had been elected in 1905 for a term expiring in 1911, was nominated to be Secretary of State. In 1907 the Secretary of State's compensation had been increased to $12,000 from $8,000. A bill reducing the compensation payable to the Secretary of State was introduced to get around the constitutional problem. Assistant Attorney General Russell opined unofficially that the purpose of the constitutional provision was "to destroy the expectation a Representative or Senator might have that he would enjoy the newly created office or newly created emoluments." 43 Cong. Rec. 2403, February, 15, 1909 quoted in S. Rep. No. 499, 93rd Cong., 1st Sess. 6 (1973) (Statement of Acting Attorney General Robert H. Bork) (hereinafter "Bork Statement"). Thus, a reduction in the salary of the office was thought to destroy that expectation, and satisfy the concerns of the Ineligibility Clause.

Most recently, in 1973, Congress reduced the salary of the Office of Attorney General from $60,000 to $35,000 to enable Senator Saxbe to assume that office.

Although some authorities have defended this practice, including an opinion of this Office, the weight of authority seems to believe that the practice is unconstitutional.[6] The thrust of the arguments supporting the practice was that it did not undermine the general purposes of the Framers in drafting the Ineligibility Clause. As Robert G. Dixon, then Assistant Attorney General of the Office of Legal Counsel, opined:

_____

[5] It is worth noting that this first example is not quite like the subsequent two cases. The salary of the office had been raised and then lowered prior to Senator Morrill's nomination. Thus, it is possible that the issue was not discussed at length. Even if it was noticed, it is one thing to say an independent change in salary does not disqualify a congressman from assuming an office at the same salary as was applicable when he took his congressional seat, but it is quite another to introduce legislation with the express aim of circumventing a constitutional prescription. The former may still not be permissible, but the latter is constitutionally far more suspect.

[6] To Reduce the Compensation of the Office of the Attorney General: Hearings Before the Senate Committee on the Judiciary on S. 2673, 93rd Cong., 1st Sess. (1973)(hereinafter "Saxbe Hearings"). At those hearings, Professors Phillip Kurland, Willard Lorenson, William Swindler, and Paul Mishkin all opposed the reduction in pay of the attorney general to enable Senator Saxbe to take the office as unconstitutional. Among the academics who testified there, only Professor William Van Alstyne believed that the practice was constitutional.

A major purpose of the Ineligibility Clause according to its originator is the prevention of the evils which would arise if legislators could benefit from the creation of new offices or increase [sic] in the emoluments of existing ones. . . Neither the public[,] nor the Executive branch, nor the Legislative branch is well-served by a prohibition so broad that it over-corrects and needlessly deprives members of Congress of opportunities for public service in appointive civil offices.  S. 2673 would overcome the former evil regarding emoluments by preventing Senator Saxbe from obtaining the benefit of the 1969 increase and any other emoluments, without wastefully barring him from offering his services to the country in an appointive office.

Nothing in the history of the Ineligibility Clause suggests that a strict literal interpretation should be adopted in cases where the action in question is totally consistent with the purpose of the Clause.

Saxbe Hearings, at 71-72 (Statement of Robert G. Dixon, Jr. Assistant Attorney General).  See also Bork Statement, at 6.

With all respect, we believe there are a number of flaws in this reasoning.  First, and most important, it simply ignores the plain language of the Ineligibility Clause.  In addition, it fails to account for many of the broader concerns addressed by the Founders during the Constitutional Convention.  The Founders had serious reservations about the wisdom of giving to the executive the power to appoint legislators to lucrative and prestigious executive and judicial offices.  They also sought to avoid the spectacle of legislators seeking an office throughout their term at the expense of their constituents.  They therefore tried to limit the instances in which the executive could offer such enticements to legislators.  Thus, to the extent that lowering salaries of vacant offices increases the frequency of such appointments, it serves to frustrate the intentions of the Framers.

Finally, it seems clear that the reduction in salary device does not act as a safeguard against violating either the letter or spirit of the Ineligibility Clause.  This is because Congress could in all cases reduce the salary of the congressman on the day before he is nominated and restore it to its increased level the day after he is commissioned.[7]  Thus, permitting this device

_____

[7] It is worth noting, however, that such a "fix" requires the cooperation of both houses of Congress, not just that of the Senate.  A bill affecting the salary of an executive or judicial office would require action by the House of Representatives. Although this fact has no constitutional implications, it may have a practical effect in the case of a controversial nominee

to circumvent the Ineligibility Clause would largely render it a nullity. That this could be accomplished is borne out by past opinions of this Office.

In 1979, Congressman Mikva was nominated to serve as a judge on the District of Columbia Circuit. The question arose whether Congressman Mikva could lawfully "be appointed to a judgeship as to which the emoluments _may_ be increased subsequent to his appointment," but during his elected term. 3 Op. O.L.C. 286, 287 (1979) (emphasis added).[8] Based upon a close reading of the language of the constitutional provision, we concluded that "the provision on its face plainly shows an intention of preventing an appointment only when an increase in the emoluments of an office precedes an appointment of that office." Id. at 288. More important for present purposes, we determined that Congressman Mikva would not be constitutionally disqualified by a subsequent increase in salary during his congressional term. We said:

> [I]f . . . it were held that a sitting Member of Congress could not be appointed to an office the emoluments of which were increased after his appointment, then Congress, by enacting a salary increase after the President had appointed him a Federal judge, would thereby retroactively invalidate the appointment. This would, in effect, amount to his removal and thus would circumvent the constitutionally mandated process of impeachment as the only existing method for removing Federal judges.

Id. at 289 n. 1.

---

[7] (Cont.) the Senate is willing to confirm who faces serious opposition in the House.

[8] Federal judges were then compensated at rates determined by the Federal Salary Act, which were adjusted pursuant to the Executive Salary Cost of Living Act. The latter Act provided that the salary rate of federal judges was to be adjusted by a percentage equal to the overall percentage of adjustments made in the rate of pay under the General Schedule. Under the Federal Pay Comparability Act of 1970, the President was to direct his agent to prepare an annual report comparing rates of pay in the public and private sectors and recommend adjustments of the former. After considering the report and findings of the Advisory Committee on Federal Pay, the President was to adjust statutory rates of pay accordingly. His adjustment would become effective in October of the applicable year. Alternatively, the President could present Congress with an alternative plan incorporating appropriate salary adjustments. That alternative was to become effective in October unless either House of Congress disapproved of the plan, in which case the initial proposal of the Advisory Committee on Federal Pay became effective. At the time Congressman Mikva was nominated, the pay raise for judges for

Thus, having concluded that there is no constitutional impediment to raising the salary of a congressman during his unexpired congressional term, but after his appointment to the office, it becomes evident that undermining the Ineligibility Clause is an extremely simple matter. The former colleagues of any congressman taking office by virtue of a reduced salary could ensure, pursuant to a prearranged agreement or otherwise, that the increased salary will be restored as soon as he takes office.[9] This would serve to diminish the degree of a congressman's impartiality -- or at least the appearance thereof -- with respect to the salaries of executive and judicial offices he covets, thus frustrating the general objective of the constitutional provision, as well as violating the precise prohibition.[10]

---

[8] (Cont.) 1979 had not yet taken effect; in fact, it had not yet been transmitted to Congress.

[9] In his testimony before the Judiciary Committee in 1973, Professor Van Alstyne considered the three possibilities in the event of an increase in Senator Saxbe's salary the moment he took office: (i) the increase would be effective; (ii) the adoption would at once disqualify him as Attorney General; and (iii) he would remain as Attorney General, but would be denied the increase. Saxbe Hearings, at 53. To Professor Van Alstyne, "the plain sense and the history of [the Ineligibility Clause] persuade me that the proper answer is the last one -- he would not be automatically disqualified, but he would be precluded from realizing any personal benefit during the balance of the term he was elected to the Senate." Thus, Professor Van Alstyne's solution to this problem is to infer an implicit prohibition against post hoc salary increases to counteract the implicit "Saxbe" exception to the Ineligibility Clause's express prohibition. Although this theory certainly serves to get around the problem we raised in our opinion concerning Judge Mikva, the constitutional provision itself in no way contemplates or supports this result. In our view, it is much more logical, and much more faithful to the Framer's intent, simply to give effect to the plain language of the Ineligibility Clause.

[10] Although it does not affect our constitutional analysis, we note as well that there are policy concerns here that were not present in the previous cases discussed above. Each of the three offices for which the retroactive salary reduction device was used in the past were in the President's cabinet. Here, a judicial office is involved, thus raising policy concerns about the independence of the judiciary. There is a long and beneficial tradition that all judges of the same rank receive the same pay. This avoids inequities and jealousies among members of the bench and, more fundamentally, congressional efforts to influence judicial decision-making through differential treatment of similarly-situated judges. Indeed, similar concerns about Congress' power to influence the judiciary through manipulation of salaries led the Founders to prohibit any decrease in a

-8-

In closing, we emphasize a point that would need no emphasis were it not too often minimized or discarded. As Chief Justice Marshall said in Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 188 (1824):

> As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey[,] the enlightened patriots who framed our constitution and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.

For this reason, departing from the actual words of the constitutional text cannot be justified on the grounds that the departure nevertheless fairly comports with some more generalized, albeit unexpressed, purpose of the Framers. In any event, such a departure is most assuredly unjustified where, as here, it does not effectuate the Framer's broader objectives as fully as does a literal interpretation of the provision's specific terms. Thus, while the language of the Ineligibility Clause is itself a fully sufficient reason to prohibit a sitting congressman's appointment, such a prohibition also more faithfully furthers the Framer's broader concerns. Given all that, to countenance stratagems that seek to avoid the force and effect of the Constitution's own terms in this context is particularly ill-advised.[11]

---

[10] (Cont.) judge's salary during his tenure on the bench. Art. II, sec. 1. While this prohibition against reducing the salary of a sitting judge is clearly not implicated here, the policy concern animating the constitutional provision nonetheless cautions against any precedent authorizing Congress to pay a particular judge less than his colleagues.

[11] "I do not regard the Constitution like the Internal Revenue Code which contemplates avoidance or evasions." Saxbe Hearings, at 9 (statement of Professor P. Kurland).

-9-

## CONCLUSION

In sum, we believe that the language and purpose of the Ineligibility Clause prohibits a sitting congressman from being appointed to the Supreme Court, even if his salary as a Justice is first reduced to the amount it was when he began his most recent term.

Charles J. Cooper
Assistant Attorney General
Office of Legal Counsel